## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| SUPERIOR OPTICAL LABS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 21-cv-01580 |
| | ) | |
| v. | ) | Filed Under Seal: February 1, 2022 |
| | ) | |
| THE UNITED STATES, | ) | Reissued: February 11, 2022* |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PDS CONSULTANTS, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## OPINION AND ORDER

This post-award bid protest challenges the decision of the Small Business Administration's ("SBA") Office of Hearings and Appeals ("OHA") finding Plaintiff Superior Optical Labs, Inc. ineligible for award under Department of Veterans Affairs Solicitation No. 36C24820R0087 ("Solicitation"). The Solicitation was set aside entirely for a Service-Disabled Veteran-Owned Small Business ("SDVOSB") to provide prescription eyeglasses and related services in Veterans Integrated Services Network ("VISN") 8 in central Florida. After Superior was awarded the contract, Defendant-Intervenor PDS Consultants, Inc. protested Superior's status as a SDVOSB. Based on a Services and Supply Agreement between Superior and its former owner, which OHA

---

*  The Court issued this opinion under seal on February 1, 2022 and directed the parties to file any proposed redactions by February 10, 2022. The opinion issued today incorporates the proposed redactions received. Redacted material is represented by bracketed ellipses "[. . .]."

found to be in effect at the time Superior submitted its offer in response to the Solicitation, OHA held that Superior did not qualify as a SDVOSB for purposes of the procurement.

Before the Court are Superior's Motion for Judgment on the Administrative Record, the Government's Cross-Motion for Judgment on the Administrative Record, and PDS's combined Motion to Dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and Cross-Motion for Judgment on the Administrative Record. For the reasons discussed below, the Court finds that it has jurisdiction over Superior's bid protest claims and that OHA rationally determined that Superior failed to qualify as a SDVOSB. Consequently, PDS's Motion to Dismiss is **DENIED**, the Government's and PDS's Cross-Motions for Judgment are **GRANTED**, and Superior's Motion for Judgment is **DENIED**.

## I. BACKGROUND

### A.   Statutory and Regulatory Background

Under the Veterans Benefits, Health Care, and Information Technology Act of 2006, 120 Stat. 3431–3436 (codified, as amended, at 38 U.S.C. §§ 8127–28), the Secretary of the Department of Veterans Affairs ("VA") is required to set annual goals for contracting with service-disabled and other veteran-owned small businesses. 38 U.S.C. § 8127(a). The VA is obligated to restrict competition for procurements to veteran-owned small businesses, including SDVOSBs, if the contracting officer ("CO") for the procurement reasonably expects that at least two such businesses will submit offers and that "the award can be made at a fair and reasonable price that offers best value to the United States." *Id.* § 8127(d); *see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 164–65 (2016).

To qualify as a SDVOSB eligible to compete for these types of procurements, a business must be "at least 51% unconditionally and directly owned by one or more service-disabled veterans." 13 C.F.R. § 125.12.[1]

A service-disabled veteran is defined by regulation as a veteran who has a valid disability rating letter issued by the VA that shows a service-connected rating between 0 and 100 percent, a valid disability determination from the Department of Defense, or is registered as a service-disabled veteran in the Beneficiary Identification and Records Locator Subsystem maintained by the VA's Veterans Benefits Administration. *Id.* § 125.11. A business that is principally owned by another business entity that is itself not owned and controlled by one or more service-disabled veterans does not qualify as a SDVOSB. *Id.* § 125.12(a).

The eligibility requirements further mandate that both the management and daily business operations of a SDVOSB must be controlled by one or more service-disabled veterans. *Id.* § 125.13(a). This "means that both the long-term decision[] making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans." *Id.* There is a rebuttable presumption that someone other than a service-disabled veteran has control, or the power to control, the business where "[b]usiness relationships exist with non-service-disabled veteran individuals or entities which cause such dependence that the applicant or concern cannot exercise independent business judgment without great economic risk." *Id.* § 125.13(i)(7). An exception exists "where a service-disabled veteran does not have the unilateral power and authority to make decisions in 'extraordinary circumstances.'" *Id.* § 125.13(m). Such extraordinary circumstances are solely limited to: "(1) Adding a new equity

---

[1] Additionally, a SDVOSB must be considered "small" in accordance with the size standard corresponding to the North American Industry Classification System (NAICS) code assigned to the contract at issue. 13 C.F.R. § 125.14(a).

stakeholder; (2) Dissolution of the company; (3) Sale of the company; (4) The merger of the company; and (5) Company declaring bankruptcy." *Id.* § 125.11.

The VA Center for Verification and Evaluation ("CVE") is responsible for certifying contractors as SDVOSBs. *See* 38 C.F.R. §§ 74.1, 74.11. OHA has authority to adjudicate protests filed by interested parties challenging a business's SDVOSB status. *See* 38 U.S.C. § 8127(f)(8)(B); 13 C.F.R. § 134.1007.

### B.   Findings of Fact

1.   Superior's Certification as a SDVOSB

Superior is headquartered in Ocean Springs, Mississippi. Admin. R. 417, ECF No. 22 ("AR"). It was founded in 1991 by a decorated Vietnam Veteran, employs roughly 191 individuals, and manufactures prescription eyeglasses. AR 2984. Superior is presently owned and controlled by Mr. Derek Bodart, who is a service-disabled veteran of the United States Navy. AR 512, 2932, 2985. Mr. Bodart obtained a controlling interest in Superior from its former owner, Essilor of America, Inc. ("Essilor"), in 2017 through an existing SDVOSB that he owned, StatSource Medical, LLC ("StatSource"). AR 421–30.

On January 29, 2018, StatSource sold Superior to Mr. Bodart and four minority shareholders. AR 2932. Since 2017, Mr. Bodart has served as Superior's President and CEO. AR 512. At all relevant times, he has owned and controlled more than 50 percent of Superior. AR 2932. At the time Superior submitted a proposal in response to the Solicitation, Mr. Bodart had a 51 percent interest in Superior, owning [. . .] of its [. . .] shares. AR 422, 2932. Two service-disabled veterans and one other individual each owned a 9 percent interest in Superior, and a fifth non-veteran/non-service-disabled individual who acted as Superior's Vice President and Chief Operating Officer had a 22 percent interest. AR 2932.

The VA CVE certified Superior as a SDVOSB on April 10, 2018.  AR 2469.  Since that time, Superior has performed multiple VA contracts, providing prescription eyeglasses and related services to veterans.  AR 2982.  In fact, Superior avers that it and PDS "have been the VA's two primary SDVOSB providers" for such services.  Pl.'s Compl. ¶ 14, ECF No. 1.

2.    Superior's Services and Supply Agreement

As part of Mr. Bodart's obtaining a controlling interest in Superior through StatSource, Superior, Essilor, and StatSource entered into a Services and Supply Agreement ("Agreement") on November 1, 2017.  AR 650; *see* AR 649–944.  Among its provisions, the Agreement included purchase requirements for Superior's existing VISN and other VA contracts.  Specifically, Superior was obligated to purchase from Essilor "the majority of the volume of Superior's purchases of lenses, frames, contact lenses and consumables . . . [if] offered by Essilor" and 15 percent of ophthalmic laboratory services.  AR 651, § 3(b).  The Agreement provided, however, that "if such amounts are not permitted under any given VISN or other Veterans Affairs' contract," Superior was required to purchase "the maximum volumes that can be sourced from Essilor without jeopardizing Superior's status as a [SDVOSB] entity and as required to maintain compliance with the SBA and Federal Acquisition Regulations [("FAR")]."  *Id.*

The Agreement had similar provisions for all future VISN and VA contracts awarded to Superior, which required Superior to source from Essilor "the majority of the volume of Superior's purchases of lenses, frames, contact lenses and consumables . . . [if] offered by Essilor" and "the maximum permitted dollar volume of Superior's ophthalmic laboratory services."  *Id.* § 3(c).  Like the existing-contracts provision, if those amounts were not permitted by any given contract, the Agreement capped Superior's purchase requirements (notwithstanding the quotas) at "the maximum volumes that can be sourced from Essilor without jeopardizing Superior's [SDVOSB]

status" and in compliance with the SBA and FAR.  *Id.*  The Agreement further required Superior to provide Essilor with monthly reports reflecting Superior's sales under VISN contracts and other data to ensure compliance with these purchase requirements.  *Id.* § 3(d).

In addition, pricing for the Lab Products/Services acquired from Essilor were outlined in price lists attached to the Agreement.  *See* AR 662–944.  Essilor could at any time increase the prices charged under the Agreement due to circumstances outside of its direct control if the price increase was permitted under any government contract.  AR 651–52, § 3(e).  If Superior intended to bid on a fixed-price government contract involving the Lab Products/Services, the Agreement further required Superior to notify Essilor in writing prior to bidding and obtain Essilor's agreement in writing for any fixed pricing offered in the bid if Superior was requesting that Essilor also commit to fixed pricing.  AR 652, § 3(e).

Other provisions of the Agreement also obligated Superior to obtain Essilor's written approval.  Such approval was required prior to Superior's assigning all or part of the Agreement.  AR 656, § 9(a).  Any attempt to do otherwise would result in Superior's defaulting on the Agreement.  AR 653–54, § 6(b)(iii).  The Agreement also required Superior to "obtain Essilor's written approval prior to any 'Change of Control.'"  AR 656, § 9(b).  This was defined by the Agreement as any (i) "change in possession, directly or indirectly, of the power to direct or cause the directing of the management or policies of Superior," (ii) any sale or transfer of 50 percent or more of Superior's assets, (iii) any sale or transfer of 50 percent or more of Superior's stock, (iv) any merger resulting in a change of ownership of 50 percent or more, and (v) any change to Superior's SDVOSB status (*i.e.*, if it ceased to be a SDVOSB).  *Id.*

The initial term of the Agreement ran from November 1, 2017, until October 31, 2027, and would automatically renew for an additional one-year term unless one of the parties provided

written notice of its desire to terminate the Agreement at least 180 days before the expiration of the initial term.  AR 650, § 2.  According to the Agreement, the term could "only be shortened in accordance with the termination provisions herein."  *Id.*  Superior and Essilor executed a Termination of Services and Supply Agreement on October 20, 2020 ("Termination Agreement"), which memorialized an earlier effective termination of the Agreement that occurred on January 29, 2018.  AR 2930.

### C.    Procedural Background

#### 1.    VA's Solicitation and Award to Superior

On August 24, 2020, the VA issued the Solicitation, seeking proposals by SDVOSBs for the provision of prescription eyeglasses and related services in VISN 8.  AR 1.  Superior and PDS each submitted timely proposals.  AR 2954.  On October 1, 2020, the VA announced that Superior was the apparent awardee.  *Id.*

#### 2.    CVE Protest and Decision

On October 8, 2020, PDS submitted a timely protest to the VA, challenging Superior's SDVOSB status.  AR 247; *see* 13 C.F.R. § 134.1004(a)(2)(i).  The CO for the Solicitation forwarded PDS's protest to OHA for review.  AR 2954.

As relevant here, PDS's protest alleged that Superior was controlled by Essilor, a non-SDVOSB entity.  AR 248.  Among its allegations, PDS asserted that: Essilor continued to have an ownership interest in Superior; Essilor and Superior shared resources, equipment, and/or services; Superior used Essilor's equipment, software, and bulk shipping discounts to manufacture and ship Superior's eyeglasses; Superior received "critical financial support from Essilor;" and Superior was contractually required to use Essilor products.  AR 249.  PDS also argued that Essilor controlled Superior through loan agreements that further required Superior to use Essilor products.

AR 251.  According to PDS, these alleged facts exhibited that Superior's relationship with Essilor caused such dependence that Superior was unable to exercise independent business judgment.  AR 250.

Superior responded to PDS's protest on October 13, 2020.  AR 392.  It refuted PDS's allegations, arguing that Mr. Bodart (a service-disabled veteran) was both the majority shareholder and the controlling director of Superior.  AR 395.  It provided evidence demonstrating that Essilor did not have an equity interest in Superior and had not since 2017.  AR 403.  It also maintained that its business relationship with Essilor did not afford Essilor with control of or the power to control Superior.  AR 400.  To the contrary, it asserted that Mr. Bodart had the requisite control over Superior and its day-to-day operations for it to qualify as a SDVOSB.  AR 407–08.

After reviewing the Case File filed by CVE on November 3, 2020, PDS moved to supplement its protest.  It argued, among other things, that the Agreement (which was referenced in the Case File) obligated Superior to purchase large amounts of supplies and equipment from Essilor, further demonstrating Essilor's control.  AR 2746–47.  The Agreement had not been included in the record provided by CVE, nor in Superior's responses to PDS's protest and supplemental protest.  AR 2899.

OHA issued an Order on February 2, 2021, requiring Superior to produce a copy of the Agreement, which it provided on February 16, 2021.  *Id.*  Superior argued that the Agreement was not in effect at the time of the Solicitation, as it had been effectively terminated on January 29, 2018, by oral agreement after StatSource sold its shares in Superior to Mr. Bodart.  AR 2903–10.  Superior also submitted a copy of the written Termination Agreement dated October 20, 2020, which memorialized the January 29, 2018 termination date.  AR 2930.  Superior further contended that the Agreement was drafted so as not to jeopardize Superior's status as a SDVOSB and had

never been enforced.  AR 2907.  It argued that because the Agreement by its terms protected Superior's SDVOSB status, it could not evidence Essilor's control over Superior in a way that jeopardized Superior's status.  AR 2909.

In response, PDS argued that the issue of Essilor's alleged control over Superior was a matter of the "power to control – not whether control is actually exercised."  AR 2940–41 (citing *Clarity Commc'ns Grp., LLC*, SBA No. SIZ-6011, at 9-10 (Jun. 17, 2019) ("[S]o long as the power to control exists, the entities are affiliated.")); *see* 13 C.F.R. § 121.103.  It cited a number of terms in the Agreement that allegedly gave Essilor an improper level of control over Superior, including the purchasing requirements and provisions that required Essilor's written approval.  AR 2942–45.  Taken together, PDS argued these terms showed that the purpose of the Agreement was to provide Essilor the opportunity to "use Superior as a tool in the VA eyeglass business, with Superior acting as a conduit for Essilor on both existing and future VA contracts."  AR 2946.

OHA issued its ruling on May 6, 2021, sustaining PDS's protest in relevant part.  AR 2953.  It found that Superior was not fully controlled by Mr. Bodart as of the date it submitted its offer (September 23, 2020) and the date PDS filed the CVE protest (October 8, 2020), which are the relevant dates for determining eligibility.  AR 2971.  OHA found the Agreement's terms, requiring Superior to obtain Essilor's written approval prior to changes of control, such as the sale or transfer of 50 percent or more of Superior's assets or stock, "plainly interfere with Mr. Bodart's ability to make all business decisions and exercise complete control over Superior."  AR 2970.  It also found that terms requiring Superior to make certain minimum purchases from Essilor and obligating Superior to obtain Essilor's approval before bidding on certain fixed-price government contracts likewise interfered with and impermissibly restricted Mr. Bodart's independent business decision-making.  AR 2971.  Because the Agreement required written termination, OHA found that the

Agreement was not terminated until October 20, 2020—the date the Termination Agreement was executed.  AR 2970.

As a result of OHA's decision, the VA cancelled Superior's contract.  *See* Pl.'s Mot. for J. Admin R. at 12, ECF No. 24; Def.'s Cross Mot. for J. Admin. R. at 15, ECF No. 26.  Based on the parties' representations at oral argument, the Court understands that PDS is currently fulfilling the work outlined in the Solicitation under a different, separate contract.

       3.    <u>Size Protest and Decision</u>

Separate from its CVE protest, PDS concurrently filed a timely size protest on October 8, 2020, alleging that Superior was not a small business, and thus ineligible for an award under the Solicitation, because of its affiliation with Essilor, a non-small business.  AR 2873–74.  PDS's size protest was based on many of the same or similar allegations raised in its CVE protest.  *Id.* The size protest was referred to the SBA's Office of Government Contracting – Area III ("Area Office") in accordance with 13 C.F.R. § 134.1001(c).  AR 2954.

The Area Office issued a size determination on November 12, 2020, rejecting PDS's argument that Superior was sufficiently affiliated with Essilor to render its business other-than-small.  AR 2875–83; *see* 13 C.F.R. § 121.103.  Notably, the Area Office found a lack of evidence supporting a finding that Essilor had the power to control Superior at the time Superior submitted its initial offer on the Solicitation.  AR 2881.

PDS filed an appeal of the Area Office's decision with OHA on November 27, 2020.  On July 7, 2021, following its decision on PDS's CVE protest, OHA vacated the size determination and remanded the case back to the Area Office.  *See Size Appeal of PDS Consultants, Inc.*, SBA No. SIZ-6107, 2021 WL 5298745 (July 7, 2021).  OHA noted that the Agreement had not been submitted to the Area Office as part of the size protest, and thus the Area Office "was unable to

fully consider Appellant's protest allegations" regarding Superior's obligation to use Essilor products. *Id.* at *5. On remand, OHA instructed the Area Office to obtain a copy of the Agreement and "assess whether in light of that agreement, Superior was affiliated with Essilor as of September 23, 2020, the date that Superior self-certified for the instant procurement." *Id.* at *6.

Superior provided a copy of the Agreement to the Area Office on July 19, 2021. After reviewing the same, the Area Office found based on the same provisions relied on in OHA's CVE decision that "the Services and Supply agreement did afford Essilor control over Superior" and that the Agreement "was still in effect on the date size is determined." Appx. 1, Def.-Intv.'s Consol. Mot. to Dismiss, Cross-Mot. J. Admin. R. & Opp'n to Pl.'s Mot. J. Admin. R. at 9, ECF No. 25-1 (*Size Determination*, Case No. 3-2021-050 (July 26, 2021)). Accordingly, the Area Office issued a new size determination on July 26, 2021, finding that Superior was "other than small" as of the date it submitted its proposal in response to the Solicitation. *Id.* at 10.

Superior has appealed the Area Office's adverse size determination and is awaiting OHA's final decision. *See* Pl.'s Reply at 22, ECF No. 27; Def.-Intv.'s Consol. Mot. to Dismiss, Cross-Mot. J. Admin. R. & Opp'n to Pl.'s Mot. J. Admin. R. at 21, ECF No. 25.

4. The Instant Action

Superior instituted this action on July 15, 2021. *See* ECF No. 1. On July 19, 2021, PDS filed its motion to intervene, which the Court granted. *See* Def.-Intv.'s Mot. to Intervene, ECF No. 10. In accordance with the Court's scheduling order, *see* ECF No. 14, the Government filed the Administrative Record on August 2, 2021. *See* ECF No. 22.

On August 12, 2021, Superior filed its Motion for Judgment on the Administrative Record, requesting the Court set aside as arbitrary and capricious and contrary to law OHA's May 6, 2021 decision that found Superior ineligible for award under the Solicitation. ECF No. 24 at 5.

According to Superior, OHA failed to properly construe the actions of Superior, Mr. Bodart, and Essilor in January 2018 as terminating the Agreement. *Id.* at 6. Superior further argues that even if it was not terminated, OHA "grossly misinterpreted" the Agreement as affording Essilor the power to control Superior. *Id.* For these reasons, Superior argues it is entitled to declaratory and injunctive relief and requests the Court enter an injunction setting aside OHA's determination and ordering the VA to reinstate Superior's contract. *Id.* at 26–27.

PDS subsequently cross-moved for judgment on the administrative record and filed a motion to dismiss. *See* ECF No. 25. It argues that OHA's determination was reasonable as the Agreement gave Essilor the power to control Superior, even if it was not exercised. *Id.* at 25. PDS further asserts that the Court does not have jurisdiction over Superior's claims because Superior no longer has a substantial chance of being awarded a contract under the Solicitation due to the Area Office's recent adverse size determination. *Id.* at 21.

The Government also cross-moved for judgment on the administrative record, asserting that OHA's decision had a rational basis and correctly applied the law. *See* ECF No. 26 at 16. The Government contends that OHA reasonably determined that Superior was ineligible for the Solicitation because the "cumulative effect" of the Agreement's restrictions and its supply mandates impermissibly restricted Mr. Bodart's ability to fully control the long-term decision making and day-to-day management of Superior. *Id.* at 24.

## II.  LEGAL STANDARDS

### A.  RCFC 12(b)(1)

On a motion to dismiss under RCFC 12(b)(1), the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236–37 (1974)).

The burden of proving subject-matter jurisdiction lies with the plaintiff. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). To come within the Court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1), the plaintiff must establish that it has standing as an "interested party"—*i.e.*, that it is "an actual or prospective bidder[] or offeror[]" and has a "direct economic interest [that] would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (emphasis omitted) (citation omitted).

**B.      RCFC 52.1**

A motion for judgment on the administrative record pursuant to RCFC 52.1 is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Court limits its review to the administrative record and "asks whether, given all the disputed and undisputed facts, a party has met its burden of proof." *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 317 (2020) (citation omitted). In contrast to the standard for summary judgment, a genuine issue of disputed fact does not prevent a court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

The Court of Federal Claims evaluates bid protests under the Administrative Procedure Act's ("APA") standard for review of agency action. 28 U.S.C. § 1491(b)(4); *Bannum*, 404 F.3d at 1351. Under that standard, "an agency procurement action may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Savantage Fin. Servs.*, 150 Fed. Cl. at 317 (quoting 28 U.S.C. § 1491(b)(4)). An agency decision is arbitrary and capricious when it "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'" *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In conducting an arbitrary-and-capricious review, a court may not substitute its judgment for that of the agency.  Even if the Court may have reached a different conclusion, it should not disturb the agency's decision "so long as there is a reasonable basis for it."  *Savantage Fin. Servs.*, 150 Fed. Cl. at 317 (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). Accordingly, the Court's review of an agency procurement decision is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

Decisions made by OHA are given further "special deference" where the SBA's expertise and familiarity with administrative rules and intricacies are at issue.  *Obsidian Sols. Grp., LLC v. United States*, 153 Fed. Cl. 334, 341–42 (2021); *Eagle Design & Mgmt., Inc. v. United States*, 57 Fed. Cl. 271, 273 (2002).  Special deference is therefore warranted when OHA has been asked to interpret SBA rules "in an intricate manner that a nonexpert court must be careful not to disrupt." *Darton Innovative Techs., Inc. v. United States*, 153 Fed. Cl. 440, 451 (2021).  The interpretation of a contract, however, is a question of law that the Court generally reviews *de novo*.  *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 327 (2012).

### III.  DISCUSSION

#### A.    Superior Has Standing to Bring This Bid Protest.

The Court begins, as it must, with the question of jurisdiction.  PDS argues that Superior lacks standing to bring this action because it is not an interested party for purposes of the Tucker Act's bid protest jurisdiction.  ECF No. 25 at 12–13.  It claims that Superior presently lacks the necessary direct economic interest because it does not have a substantial chance of being awarded the VISN 8 contract in light of the outstanding adverse size determination.  *Id.*  PDS does not

14

dispute that Superior *had* a direct economic interest sufficient to confer standing as of the date it filed its Complaint.  Since the event that allegedly deprived Superior of standing occurred during the course of this litigation, the issue presented is one of mootness.  *See id.* at 22 n.3 (raising mootness as an alternative argument).  For the reasons discussed below, the Court finds that Superior's claims are not moot and the Court maintains jurisdiction to rule on the parties' cross-motions for judgment.[2]

To demonstrate standing in a post-award bid protest, the plaintiff is required to establish that it is an interested party, meaning it "is an actual or prospective bidder[] and . . . possesses the requisite direct economic interest."  *Rex Serv. Corp.*, 448 F.3d at 1307.  To show a "direct economic interest," the plaintiff must prove that it had a "substantial chance" of receiving the contract.  *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 5 (2007) (citing *Rex Serv. Corp.*, 448 F.3d at 1307); *see Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding in the sole-source procurement context that a plaintiff "need only establish that it 'could compete for the contract.'" (citation omitted)).  The substantial chance standard, in turn, requires a plaintiff to show that it was prejudiced by an error in the procurement process.  *See Rex Serv. Corp.*, 448 F.3d at 1308 (citing *Statistica*, *Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  Stated another way, Superior has standing if it demonstrates that "but for the error" challenged in this protest it "would have had a substantial chance of securing"

---

[2] Contrary to PDS's argument, this is an issue of mootness regardless of the retroactive nature of the adverse size determination.  *See* ECF No. 25 at 22 n.3.  The parties do not dispute that size is determined as of the date the concern self-certifies as small as part of its initial offer or response including price and that the Area Office decision applies to the VISN 8 contract award even though the protest was filed after the award.  *See* 13 C.F.R. §§ 121.404(a), 121.1004(c).  However, that the Area Office found Superior to be other than small as of the time of the procurement in September 2020 does not rewrite history.  The fact of the matter remains that at the time Superior filed suit in July 2021 no adverse size determination had yet been issued, and it unquestionably had standing to pursue this protest.

the VISN 8 contract at issue.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

"'[S]tanding is to be determined as of the commencement of suit.'"  *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)); *see Anderson v. United States*, 344 F.3d 1343, 1350 (Fed. Cir. 2003) (holding that the Court of Federal Claims "applies the same standing requirements enforced by other federal courts created under Article III").  This is because "[t]he rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention."  *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975).  On the other hand, if developments arise during litigation that extinguish the presence of a live "case or controversy," courts typically apply the doctrine of mootness.  *See Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764, 770 (Fed. Cir. 2019).

Standing and mootness, although related, are distinct concepts.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–92 (2000) (examining the differences between standing and mootness).  As the Supreme Court recently explained, standing requires the plaintiff to demonstrate at the outset the elements of injury, traceability, and redressability, "[a]nd if in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021); *see Bluestar Energy Servs. v. United States*, 100 Fed. Cl. 607, 617 (2011) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  A claim is typically considered moot when "there is no reasonable expectation . . . that the alleged violation will recur"

and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *L.A. Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted); *see Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). If, notwithstanding intervening events, the "court can fashion *some* form of meaningful relief" for the plaintiff, then the claim is not moot. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (emphasis in original).

Neither PDS nor Superior cited any cases in their briefs involving, as here, a question of whether a plaintiff's bid protest claim was mooted by events occurring during litigation that purportedly destroyed the plaintiff's status as an interested party. The Court independently identified a recent decision of the United States Court of Appeals for the Federal Circuit that is instructive, *Acetris Health, Inc. v. United States*, 949 F.3d 719 (Fed. Cir. 2020). In *Acetris*, a prospective bidder brought a pre-award bid protest against the VA, challenging the agency's interpretation of federal law defining the country of origin of pharmaceutical products for purposes of determining whether such product is U.S.-made. *Id.* at 722. Following the filing of its complaint, Acetris submitted an unsuccessful offer in response to the solicitation immediately at issue in the case. *Id.* at 725. Of the three bidders, Acetris's offer was the highest, and the Government moved to dismiss on grounds of mootness. *Id.* at 726.

The Federal Circuit agreed with the Government in part. It held that the Court of Federal Claims erred by assessing standing solely on the allegations of the complaint without consideration of later events (*i.e.*, Acetris's third place offer). *Id.* Based on those events, the Court found that Acetris's claim was moot with respect to the solicitation on which it bid because Acetris would not have been awarded the contract even if it were correct on the merits of its protest. *Id.* at 726–27 ("Because Acetris cannot show prejudice resulting from the VA's purportedly flawed

interpretation . . . as applied to the [] solicitation, Acetris has no injury-in-fact with respect to that solicitation."). It therefore held that Acetris "[did] not *now* have standing to challenge the [] solicitation." *Id.* at 727 (emphasis added). The Court, however, held that the protest was not moot with respect to claims related to future proposed procurements because Acetris had standing as an interested party as to those claims. *Id.*

Applying *Acetris*, this Court must determine whether Superior's claims are moot because it no longer maintains standing to bring this protest in light of the adverse size determination issued after it filed suit. There is no dispute that, even if Superior is successful in this protest, the VA cannot presently reinstate the VISN 8 contract award because of the Area Office's July 26, 2021 decision finding Superior other than small for purposes of that contract. *See* 13 C.F.R. §§ 121.1009(g)(2), (g)(5); *see also Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 364 (2007). This, however, does not necessarily mean that Superior is deprived of interested-party status, and thus this Court of jurisdiction, even though the Court cannot grant the full relief it requests.

Well-established, binding precedent makes clear that the crux of the substantial chance inquiry is the requirement of prejudice. *See, e.g.*, *Myers Investigative & Sec. Servs.*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). In cases where courts have found a lack a direct economic interest, the alleged error at issue was found to be non-prejudicial because it was not the cause (or the only cause) of the plaintiffs' failure to receive a contract award. In other words, the plaintiffs suffered no harm or injury-in-fact from the protested error in light of a different circumstance that was independent from and unaffected by that error. *See, e.g.*, *Acetris*, 949 F.3d at 726–27; *Rex Serv. Corp.*, 448 F.3d at 1308 (plaintiff failed to submit a bid and the alleged procurement error would not have required the agency to re-open the solicitation at issue); *Fed. Data Corp. v. United States*, 911 F.2d 699, 704 (Fed. Cir. 1990) (protestor who voluntarily

withdrew bid affirmatively relinquished chance to receive contract notwithstanding alleged violations of procurement law); *Labatt Food Serv.*, 577 F.3d at 1381 (untimely response to solicitation amendment prevented award to plaintiff, regardless of the agency's alleged error in receiving bids differently than prescribed).

Here, that circumstance—the recent adverse size determination—directly resulted from the CVE decision at issue in this protest.  Indeed, before OHA issued the CVE decision (and thus before Superior filed this protest), the Area Office determined that Superior was a small business eligible to compete for the VISN 8 contract.  AR 2883.  The subsequent adverse size determination occurred only after OHA issued the CVE decision and then, in the separate size appeal, remanded the size determination to the Area Office for the explicit purpose of considering whether the Agreement, which formed the basis of the CVE decision, changed the Area Office's conclusion. *Size Appeal of PDS*, 2021 WL 5298745, at *6; *see* ECF No. 25-1 at 4.  It did.  After acknowledging in a long block quote OHA's analysis of the Agreement in the CVE decision, the Area Office reached the same conclusion as OHA based on the same grounds the Court is reviewing now— *i.e.*, that the Agreement gave Essilor the power to control Superior and that the Agreement was in effect at the time of the VISN 8 procurement.  *See* ECF No. 25-1 at 8–9; *id.* at 9 ("[T]he Area Office finds that the Services and Supply agreement did afford Essilor control over Superior throughout the term of the agreement. . . . [which] was still in effect on the date size is determined.").

Although no party cited a case addressing the question of standing in analogous circumstances, the Court identified *Draken International, Inc. v. United States*, 120 Fed. Cl. 383 (2015), as a useful comparator.  In *Draken*, a bidder challenged the procurement process related to a Navy solicitation for the provision of both subsonic and supersonic aircraft.  *Id.* at 386.  Draken

alleged, among other things, that extraordinary procurement delays had made it more difficult (indeed, impossible for Draken) to provide the two types of aircraft in compliance with the solicitation's requirements, which resulted in a purportedly defective and anticompetitive selection process. *Id.* at 391. The Government argued that Draken lacked standing because it could no longer meet one of the aircraft requirements and thus "currently does not have a substantial chance of receiving the contract." *Id.* at 392; *see id.* at 391, 392 n.7. The court disagreed, emphasizing that standing "'turns on whether the protester would have had a substantial chance *if not for the alleged errors*.'" *Id.* at 392 (emphasis in original) (quoting *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012)). It held that if the Navy had not delayed the anticipated award date by one year the requirements would not have been financially prohibitive for Draken and it could have met the solicitation terms. *Id.* Thus, Draken "had a 'substantial chance' of being awarded the contract, but for the alleged defect in the procurement process," *i.e.*, the delay. *Id.*

The same logical connection between the challenged error and resulting injury exists here. The alleged error in this case is OHA's CVE decision concluding that the Agreement demonstrated Essilor's power to control Superior and that such agreement was in effect at the time of the VISN 8 procurement. ECF No.1 ¶¶ 34–38. Superior claims this conclusion is arbitrary and capricious and contrary to law. *Id*. ¶ 4. If OHA's alleged error had not occurred, the VA would not have terminated Superior's contract on the basis that it was not a SDVOSB, and the Area Office would have had no reason to reconsider its initial, favorable size determination. In other words, regardless of the fact that the CVE decision and adverse size decision present separate obstacles to Superior's contract award, they are nonetheless related and arise from the same error challenged in this protest. The Court therefore finds that Superior, both at the time of filing this protest and currently,

has a direct economic interest sufficient to confer standing.  *See Acetris*, 949 F.3d at 726–27; *Draken*, 120 Fed. Cl. at 392.

That PDS acknowledged at oral argument the temporary nature of Superior's purported standing defect further emphasizes that the issues in this protest continue to present a live controversy and that Superior continues to have a personal stake in the outcome.[3]  *See Davis*, 440 U.S. at 631; *Bluestar Energy Servs.*, 100 Fed. Cl. at 617.  PDS does not cite any authority supporting the contention that the Court lacks jurisdiction over a bid protest where post-filing events may temporarily affect the plaintiff's standing allegations.  Indeed, such argument would be contrary to the mootness doctrine, which typically requires (with some exceptions not relevant here) a showing that interim events have "completely and irrevocably eradicated the effects of the alleged violation."  *Davis*, 440 U.S. at 631 (internal quotation marks omitted).

Nor does VA's present inability to reinstate Superior's contract award because of the Area Office's adverse size determination eliminate the Court's ability to "fashion *some* form of meaningful relief" for Superior, if it is successful on the merits.  *Church of Scientology of Cal.*, 506 U.S. at 12 (emphasis in original).  Even an order setting aside the CVE decision and termination of Superior's contract as arbitrary and capricious and/or contrary to law would effectuate beneficial relief to Superior.  *See* ECF No. 1 at 11 (Prayer for Relief, ¶ 1); *Church of Scientology of Cal.*, 506 U.S. at 12.  PDS's suggestion that an order granting judgment in Superior's favor in this protest would be irrelevant to the separate size appeal does not engage with the facts.  *See* Def.-Intv.'s Reply at 8 n.1, ECF No. 28.  If the Court set aside the CVE decision

---

[3] PDS's counsel conceded that no matter what OHA decides in the appeal of the Area Office's size decision—whether OHA reverses or affirms—Superior would *then* have standing to pursue a protest.  She advocated for dismissal at this time but noted that the Court could, in the alternative, stay the case until OHA issues its size appeal decision and, if it affirms, allow Superior to amend its Complaint to challenge that decision as well.

because, for example, it found the Agreement was terminated prior to Superior's submitting its offer on the Solicitation, that ruling's effect on the size appeal pending before *the same administrative body* reviewing a decision based *on the same grounds* is well outside the realm of speculation and optimistic predictions.

Accordingly, the Court has jurisdiction over Superior's claims.

**B.     OHA's CVE Decision Was Neither Arbitrary and Capricious Nor Contrary to Law.**

OHA's decision granting PDS's CVE protest and finding that Superior was not a SDVOSB because it was not fully controlled by a service-disable veteran (Mr. Bodart) as of the date it submitted its offer on the VISN 8 contract was rational.   The Court agrees with OHA's interpretation of the Agreement, including the requirements related to termination, change of control, purchasing, and fixed-pricing approval.   Based on the record before OHA, the Court also finds that it rationally concluded that the Agreement was in effect at the time relevant for determining Superior's SDVOSB status and that the Agreement's terms, taken together, gave Essilor the power to control Superior within the meaning of the applicable regulations.   OHA's decision was therefore not arbitrary or capricious, nor was it contrary to law.

1.     Date of Contract Termination

First, OHA reasonably concluded that the Agreement was in effect at the time Superior submitted its offer in response to the Solicitation on September 23, 2020, and at the time PDS filed its CVE protest on October 8, 2020.   There is no dispute that the Agreement was at some point terminated, and thus OHA reasonably predicated its conclusion on determining when termination was effectuated in accordance with the Agreement's terms.   Superior claims that OHA ignored evidence demonstrating that the Agreement was effectively terminated by oral notice in January 2018 and never enforced during the time that Mr. Bodart has been the majority shareholder.   ECF

No. 24 at 16.  Even if written notice were required, Superior argues that the new price schedule provided by Essilor and the memorialization of the effective termination date in the Termination Agreement both sufficed.  *Id.* at 17.  The Court disagrees.

OHA correctly determined that the Agreement required written consent of all parties to effectuate a termination.  The Agreement expressly stated that the initial ten-year term started on November 1, 2017, and ended October 31, 2027.  AR 650, § 2.  The Agreement automatically renewed for an additional year unless one of the parties gave "written notice to the other party of its desire to terminate th[e] Agreement" at least 180 days before the initial term ended.  *Id.*  It expressly stated that the "Term" (defined as the renewal term together with the initial term) could "only be shortened in accordance with the termination provisions herein."  *Id.*  The provision addressing amendment and waiver was similarly conditioned on the express requirement of the parties' written consent.  AR 659, § 12(m) (amendment and waiver permitted "with (and only with) the written consent of all of the Parties.").  Superior does not meaningfully dispute this plain language interpretation.  *See* ECF No. 24 at 14, 16.

Instead, Superior finds fault in OHA's application of the termination requirements to the facts presented in the record.  Contrary to Superior's argument, however, OHA's decision did not ignore evidence showing that Mr. Bodart notified Essilor in January 2018 that Superior would be obtaining products through competitive bidding, rather than under the Agreement's purchasing obligations.  *See* AR 2961–62.  Nor did it ignore Mr. Bodart's explanation that, after January 2018, the Agreement was not enforced and that Superior never purchased lenses or materials from Essilor under the Agreement.  *See* AR 2961–62, 2971.  Although not specifically spelled out in its analysis, OHA impliedly rejected that these circumstances were sufficient to terminate the Agreement by its terms.  *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*, 419 U.S. 281, 285–86 (1974)

("While [a court] may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal citations omitted)).  As OHA noted, the only written notice presented in the CVE protest was the Termination Agreement.  As such, OHA held that termination "in accordance with the termination provisions" of the Agreement did not occur until the date of that agreement (October 20, 2020).  AR 2970.

Superior has not shown that its and Essilor's course of conduct, or the new price schedule under which Superior purchased materials from Essilor, constituted a permissible termination of the Agreement.  Setting aside the written notice requirement, this evidence does not demonstrate the parties' intent to terminate the Agreement in its entirety as opposed to simply waiving the purchasing and price list requirements.  As the Government correctly observes, the Agreement included other independent terms, such as the change of control provision on which OHA's decision was in part based.  *See* ECF No. 26 at 20; *see also* AR 2970–71.  The evidence Superior submitted in the CVE protest does not speak to the parties' intent vis-à-vis the remainder of the Agreement, other than to note that the new price schedule provided by Essilor lacked "any purchase obligations *or other contractual obligations*."  AR 2933, ¶ 7 (emphasis added); *see* AR 2936, ¶ 8.  Superior, however, did not submit a copy of the new price schedule in the CVE protest, and thus it is absent from the record before this Court.[4]

---

[4] It is therefore not necessary to address Superior's argument that under Mississippi law course-of-conduct evidence can supersede contradicting provisions of a written agreement.  *See* ECF No. 24 at 16; ECF No. 27 at 7.  Even assuming the argument was not waived, as the Government and PDS contend, Superior fails to identify any case in Mississippi or elsewhere in which a court has found that a course of conduct negated an *entire* written contract.  It is also worth noting that the Agreement prohibited any course of conduct to operate as a waiver of any power or right conferred therein, which should apply with the same force to an argument the Superior's and Essilor's course of conduct terminated *all* powers and rights under the Agreement.  *See* AR 659, § 12(m).

Superior's reliance on the Termination Agreement likewise fails.  As discussed, a plain reading of the Agreement requires the parties to give their written consent to terminate the Agreement before the end of the then-current term.  No such writing appears in the record until the Termination Agreement.  By its terms, that document became effective when signed on October 20, 2020—12 days after PDS filed its CVE protest.  AR 2930.  The Court agrees that allowing the parties to enforce an earlier effective date, which was based on oral notice of termination, by later memorializing the effective date in writing completely undercuts the force of the Agreement's written notice/consent requirements.  *See* ECF No. 26 at 18 (citing *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997) (contract interpretation "must assure that no contract provision is made inconsistent, superfluous, or redundant")).  In sum, the Court finds that OHA rationally determined that the Agreement was not terminated until after the relevant dates for determining Superior's SDVOSB eligibility.

2.  <u>Evidence of Power to Control</u>

OHA also reasonably concluded that the Agreement impermissibly gave Essilor the power to control Superior.  This finding was grounded on obligations set forth in three aspects of the Agreement, including the "Change of Control" provision, the purchasing requirements, and the written approval requirement for fixed-priced bidding.  *See* AR 2970–71.  The Court addresses each basis in turn.

a.  *Change of Control*

The Agreement required Superior to get "Essilor's written approval prior to any Change of Control."  AR 656, § 9(b).  This included written approval for: (i) "change in possession, directly or indirectly, of the power to direct or cause the directing of the management or policies of Superior," (ii) any sale or transfer of 50 percent or more of Superior's assets, (iii) any sale or

transfer of 50 percent or more of Superior's stock, (iv) any merger resulting in a change of ownership of 50 percent or more, and (v) any change of Superior's SDVOSB status. *Id.*

Superior argues that OHA narrowly understood these changes of control.  It takes issue with the language OHA used to summarize the Agreement, pointing out that OHA described the Agreement as requiring Superior to obtain Essilor's written consent prior to a "change in management or in policies," rather than "change in *possession*, directly or indirectly, *of the power to direct or cause the directing of* the management or policies of Superior," and prior to "a sale of assets," rather than a "sale or transfer by StatSource or Superior *of fifty percent (50%) or more of its assets* . . . ."  ECF No. 27 at 19 (emphasis in original) (citing AR 2923, § 9(b)).  However curtly OHA may have summarized the Agreement's change of control provision in its analysis, it correctly determined that this provision went beyond the five "extraordinary circumstances" in which the SBA will not find that a lack of control exists even though a service-disabled veteran does not have unilateral power and authority to make decisions.  AR 2970–71 (citing 13 C.F.R. §§ 125.11, 125.13(m)); AR 2967 (accurately describing change of control provision in background).  As the Government and PDS note, the permitted extraordinary circumstances plainly do not include: (1) asset sales or transfers, regardless of the percentage of assets and parties involved; or (2) changes in who has the power to direct or cause the directing of management or policies.  *See, e.g.*, ECF No. 28 at 22–23; *see also* 13 C.F.R. § 125.11 (defining extraordinary circumstances as adding a new equity stakeholder; dissolution, sale, or merger of the company; and declaring bankruptcy).

According to Superior, because of Mr. Bodart's position as majority shareholder, President, and controlling director, "for any of the Agreement's change of control situations to be implicated, Mr. Bodart would have to relinquish his control over the company," which would likely implicate

expressly exempt circumstances such as the sale of the company.  ECF No. 27 at 19.  Superior

further argues that it was "patently irrational for OHA to conclude that Superior was not owned

and controlled by Mr. Bodart due to the theoretical possibility that Essilor could have (though

never did) veto situations in which *Mr. Bodart voluntarily relinquished* control."  *Id.* (emphasis in

original).  As an initial matter, the Court is not persuaded by the premise of Superior's contention.

The Government and PDS aptly note that a sale of Superior's assets is not limited only to a sale of

its stock (of which 51 percent is held by Mr. Bodart); for example, the sale of 50 percent or more

of Superior's inventory would suffice.  *See* ECF No. 25 at 40 (noting that the change of control

provision separately addresses the sale and transfer of assets and the sale and transfer of equity

interests such as stock); *see also* ECF No. 26 at 26.  Nor would the sale or dissolution of the

company necessarily be required to transfer some or all of the responsibility for management and

policy direction to someone other than Mr. Bodart; for example, this could be implicated by

appointment of one of the other service-disabled-veteran shareholders to serve as an interim

President if Mr. Bodart were to become incapacitated.  *See* ECF No. 26 at 26.  In either case,

Superior would be required to obtain Essilor's prior written approval.[5]

Additionally, that some scenarios under the change of control provision could be

implicated by Mr. Bodart's own choice to relinquish control does not appear to be legally relevant

under the SBA's definition of extraordinary circumstances.  *See* 13 C.F.R. § 125.11.  Indeed, a

service-disabled veteran's power to control the long-term decision-making and the day-to-day

---

[5] As Superior points out, these hypotheticals were not raised in OHA's decision.  *See* ECF No. 27 at 18.  Rather, OHA rationally compared the terms of the Agreement to the applicable regulation to determine whether any control conferred to Essilor by the change of control provision was permissible.  AR 2970–71.  But Superior's claim that—in reality—the provision would be implicated only in certain scenarios (like Mr. Bodart selling all his shares) that would supposedly qualify as extraordinary circumstances begs the question whether other plausible hypotheticals exist.  That some do seems to further bolster the reasonableness of OHA's decision.

operations of a business includes, in certain circumstances, the power to surrender control. Accordingly, OHA reasonably concluded that this provision "plainly interfere[d] with Mr. Bodart's ability to make all business decisions and exercise complete control over Superior under 13 C.F.R. § 125.13, as Mr. Bodart would have to obtain the consent of Essilor, a non-SDVOSB, before implementing these decisions." AR 2970.

<i>b.  Purchase Requirements</i>

The Agreement also required Superior to purchase certain minimum amounts of Lab Products/Services from Essilor for all existing and future VISN and other VA contracts. AR 651, §§ 3(b)–(c). However,"if such amounts [were] not permitted under any given VISN or other [VA] contract," the Agreement limited the purchasing requirement to "the maximum volumes that [could] be sourced from Essilor without jeopardizing Superior's status as a Service-Disabled Veteran-Controlled entity and as required to maintain compliance with the SBA and Federal Acquisition Regulations." *Id.* § 3(b); *see id.* § 3(c). Superior argues that the purchase requirements were "deliberately drafted to avoid jeopardizing Superior's size and status," and it was therefore irrational for OHA to conclude that these requirements evidenced Essilor's power to control Superior. ECF No. 24 at 17.

Contrary to Superior's contention, OHA did not ignore the limiting language regarding "jeopardizing Superior's [SDVOSB] status." AR 2971. It specifically found that such limitation was only implicated if the maximum amounts were not permitted under a government contract, and thus it was "not evident that Superior could have refused an Essilor demand to purchase optical supplies and services under the Agreement, unless compliance would have caused Superior to be in breach of a VA contract." *Id.* Reviewing the provisions *de novo*, the Court agrees with OHA's interpretation. In the two references to not "jeopardizing Superior's status," the language is

preceded by and conditioned upon a statement that a reduction of the quotas applied only "*if* such amounts are not permitted" under the applicable contract.  AR 651, § 3(b) (emphasis added); *see id.* § 3(c).  Rules of contractual interpretation require the Court to give plain meaning to conditional clauses, such as those preceded by the word "if."  *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed. Cir. 1987) ("It is well established that where, as here, the provisions of a contract are phrased in clear and unambiguous language, 'the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties . . . .'") (quoting *Elden v. United States*, 617 F.2d 254, 260–61 (Ct. Cl. 1980)); *accord BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1273 (Fed. Cir. 2002).  The limiting language thus plainly would come into play only upon the condition first being met.

Superior argues that such an interpretation is irrational because it renders the "jeopardizing" language superfluous.  ECF No. 27 at 17.  Instead, it posits that the Agreement must be read as not requiring Superior to purchase supplies or services if doing so would "jeopardize[e] Superior's [SDVOSB] status" independent of whether such amounts were permitted under any given VISN or VA contract.  *Id.*  If that were the case, there would have been no reason to insert the conditional clause, and such clause would be superfluous itself.  Superior's argument concedes as much.[6]  *See id.* at 16 ("[I]f Superior's ability to fulfill a particular order or

---

[6] Superior raises a broader argument that the Agreement cannot reasonably be interpreted in a way that would call into question Superior's SDVOSB eligibility because it would frustrate the entire purpose of the Agreement—*i.e.*, to protect Superior's status.  *See* ECF No. 24 at 18–19; ECF No. 27 at 15–18.  Contract interpretation, however, begins and ends with the unambiguous language of the contract terms.  *George Hyman Constr.*, 832 F.2d at 579.  Whatever Superior and Essilor's intent, OHA did not act irrationally by looking to the plain language of the Agreement to discern whether its terms improperly afforded Essilor control or the power to control Superior.  In fact, that Superior and Essilor found it prudent, "[o]ut of an abundance of caution, in order to protect and preserve Superior's status as a SDVOSB," to start obtaining products competitively and with a new price schedule from Essilor—rather than under the purchasing requirements of the

a particular quantity is already precluded by the terms of a contract, the language regarding not 'jeopardizing Superior's [SDVOSB] status' and compliance with regulations would never be implicated.").

Superior also takes issue with OHA's failure to distinguish an earlier OHA decision in *Matter of: Data Voice, Inc.*, SBA No. 455 (1994), from the case at issue.  *See* ECF No. 24 at 21. As this court has noted, "OHA is bound to follow its own precedent absent limited exceptions." *Precise Sys. v. United States*, 122 Fed. Cl. 263, 270 (2015); *see* 13 C.F.R. § 134.226(a)(2).  In *Data Voice*, the petitioner applied for consideration under Section 8(a) of the Business Opportunity Development Reform Act of 1988.  *Matter of: Data Voice, Inc.*, SBA No. 455, 1994 WL 113291, at *2 (Mar. 3, 1994).  To qualify under the Section 8(a) Program, an applicant must be controlled and at least 51 percent unconditionally owned by an individual who is determined by SBA to be socially and economically disadvantaged.  *See* 13 C.F.R. §§ 124.103, 124.104.  The petitioner's application was denied in part because it had a supply agreement with a non-disadvantaged entity that required it to purchase "at least 50%" of products from that entity.  *See Data Voice*, 1994 WL 113291, at *6.  The initial agency decision-maker found that the supply agreement was severely restrictive, limited the petitioner's ability to compete, and indicated dependence on the non-disadvantaged entity.  *Id.* at *3.   OHA reversed stating:

> Having control of a firm, or having the power to control a firm, as those terms are used in Section 124.104, means possessing the ultimate ability to manage and direct the daily operations of the business to the exclusion of the individual or individuals who have been found to be disadvantaged.  It does not mean having an influence over the general operation of the business or being able to affect managerial decisions to some limited extent.

---

Agreement—tends to directly undermine Superior's frustration of purpose claim.  AR 2933, ¶ 7; *see* AR 2910.

*Id.* at *23.

As the Government and PDS note, the agreement in *Data Voice* is distinguishable.  *See* ECF No. 26 at 24; ECF No. 25 at 36.  Other than the minimum purchasing requirement, there is no indication in the *Data Voice* decision that there were other similar provisions in the supply agreement that evidenced the same degree of power to control as are at issue here.  Nor does the *Data Voice* decision suggest that a supply agreement's purchasing requirement could never support a finding of control if the broader context of the business relationship were different.  Indeed, in *Data Voice*, OHA looked holistically at the arrangement—not merely one individual term—to determine whether the preponderant evidence demonstrated control or the power to control.  *See Data Voice,* 1994 WL 113291, at *9.  Accordingly, OHA did not irrationally interpret the Agreement's purchasing requirements or err by failing to apply *Data Voice*.[7]

### 3.   Fixed-Pricing Approval Requirement

In addition to establishing pricing in accordance with price lists provided by Essilor, the Agreement required Superior to (1) notify Essilor in writing prior to it bidding on any government contract that required a fixed-price bid for Lab Products/Services subject to the purchasing requirements and (2) obtain written consent from Essilor insofar as Superior was requesting Essilor to be bound by fixed pricing.  AR 652, § 3(e).  Superior argues that OHA mischaracterized the Agreement's obligations with respect to fixed-price bidding and irrationally concluded the

---

[7] Another distinguishing factor is that Superior—unlike the petitioner in *Data Voice*—is not petitioning for eligibility under Section 8(a) where 13 C.F.R. § 124.104 controls.  Here, 13 C.F.R. § 125.13 sets forth the standard for determining control, which includes assessing whether any business relationships exist between a SDVOSB and non-service-disabled veteran entity that causes "such dependence that the [] concern cannot exercise independent business judgment without great economic risk."  *Id.* § 125.13(i)(7); *see Data Voice*, 1994 WL 113291, at *8 (rejecting argument that dependence equated with control or power to control for determining Section 8(a) eligibility).

provision afforded control "where none was present."  ECF No. 26 at 21.  According to Superior, mere notification does not, by itself, constitute control, nor does the approval requirement because it is triggered only at Superior's discretion.  ECF No. 24 at 25–26.

Superior is correct that the terse reference in the analysis of OHA's decision overstates the approval requirement for fixed-pricing, although OHA accurately described it in background.  *See* AR 2967, 2971.  Nonetheless, OHA reasonably determined that this provision likewise gave Essilor power to control Superior.  Setting aside the notification requirement, the Agreement plainly permitted Essilor to stop Superior from bidding on a fixed-price government contract if Superior was also requesting Essilor to fix its prices.  Superior does not contest that such requirement gave Essilor some degree of power to control Superior in such scenario.  *See* ECF No. 24 at 25 (arguing only that the requirement could not jeopardize Superior's status when read in connection with the purchasing requirements).  Instead, it makes much of the fact that Superior could avoid the requirement entirely by simply not making such request.  *See id.* at 26; ECF No. 27 at 21.  That is true, but Essilor's power to control seems apparent in either scenario—directly in the former and indirectly in the latter.  If, for example, Mr. Bodart determined it was in Superior's interest to request Essilor to fix its pricing for purposes of submitting a bid on a fixed-price government contract, he had to choose between subjecting the bid to Essilor's prior approval or foregoing Superior's interest in order to bid without Essilor's agreement.  That choice (discretionary as it may be) imposed a restriction on Mr. Bodart's decision-making that otherwise would not exist but for the Agreement, and it therefore ceded to Essilor some power to control Superior.  OHA thus rationally determined that the provision restricted Mr. Bodart from fully exercising control over Superior's long-term decision-making and day-to-day management of Superior.

\*     \*     \*

In sum, based on the record before the Court, Superior has not demonstrated that OHA's CVE decision was arbitrary and capricious or contrary to law.  OHA correctly interpreted the Agreement and, considering the relevant evidence and applicable law, rationally concluded that the purchasing requirements and certain of Essilor's approval rights under the Agreement, taken together, demonstrated that Mr. Bodart did not have the requisite control over Superior at the time of the procurement to qualify as a SDVOSB.

### C.     VA's Rescission of the VISN 8 Contract Award to Superior Was Rational.

As Superior correctly notes, this court has held that a procuring agency's reliance on an irrational decision of a reviewing agency following a protest is itself arbitrary and capricious.  ECF No. 24 at 26 (citing *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 579 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011) (finding reliance upon irrational GAO recommendation arbitrary and capricious)).  Here, however, there is no such irrational predicate decision.  Because there was a rational basis for OHA's ruling that Superior was not a SDVOSB eligible for award under the Solicitation at the time of the procurement, VA acted rationally by relying on the CVE decision and canceling the VISN 8 contract with Superior.  Indeed, cancellation was required by regulation.  *See* 13 C.F.R. § 134.1007(j)(2) (requiring CO to rescind contract of awardee who is subsequently found by OHA to be ineligible for inclusion in the CVE database).

### IV. CONCLUSION

For these reasons, the Court **GRANTS** the Government's and PDS's Cross-Motions for Judgment on the Administrative Record (ECF Nos. 25, 26), except that PDS's combined Rule 12(b)(1) Motion to Dismiss is **DENIED**.  The Court **DENIES** Superior's Motion for Judgment on the Administrative Record (ECF No. 24).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after February 15, 2022, unless the parties submit **by no later than February 10, 2022**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: February 1, 2022                              _____/s/ Kathryn C. Davis_____
                                                                          KATHRYN C. DAVIS
                                                                          Judge